**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-1120**

———————

CPI SECURITY SYSTEMS, INC.,

Plaintiff - Appellee,

v.

VIVINT SMART HOME, INC., f/k/a Mosaic Acquisition Corp.; LEGACY VIVINT
SMART HOME, INC., f/k/a Vivint Smart Home, Inc.,

Defendants - Appellants.

———————

Appeal from the United States District Court for the Western District of North Carolina, at
Charlotte. Max O. Cogburn, Jr., District Judge. (3:20-cv-00504-MOC-WCM)

———————

Argued: January 28, 2025                                    Decided: July 22, 2025

———————

Before NIEMEYER, BENJAMIN, and BERNER, Circuit Judges.

———————

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge
Benjamin and Judge Berner joined.

———————

**ARGUED:** Ellyde Roko Thompson, QUINN EMANUEL URQUHART & SULLIVAN,
LLP, New York, New York, for Appellants. Jeffrey Bryan Wall, SULLIVAN &
CROMWELL LLP, Washington, D.C., for Appellee. **ON BRIEF:** Alex Bergjans, Los
Angeles, California, Rachel E. Epstein, Daily Guerrero Chen, QUINN EMANUEL
URQUHART & SULLIVAN, LLP, New York, New York, for Appellants. Charles C.
Eblen, Kansas City, Missouri, Eric J. Hobbs, Denver, Colorado, Caroline M. Gieser,
SHOOK, HARDY & BACON LLP, Atlanta, Georgia; Judson O. Littleton, Anna Cecile

Pepper, Washington, D.C., Leslie B. Arffa, SULLIVAN & CROMWELL LLP, New York, New York, for Appellee.

NIEMEYER, Circuit Judge:

When a business deliberately engages in widespread unfair competition against one of its rivals over a period of years, the consequences can be expensive. In this case, a jury found that Vivint Smart Home, Inc., a home security company, did just that against CPI Security Systems, Inc., a competing home security company, and awarded CPI a total of $189.7 million in compensatory and punitive damages.

The jury heard evidence that Vivint salespersons regularly and deliberately lied to CPI's customers to induce them to become Vivint customers. More specifically, Vivint salespersons told CPI customers that Vivint had purchased CPI and would be taking over their accounts, that CPI was otherwise going out of business and would no longer be monitoring their alarm systems, and that Vivint had manufactured their equipment and needed to upgrade their systems. As a result, Vivint was able to lure away many CPI customers, causing CPI substantial losses. The jury returned a verdict finding that Vivint (1) violated the Lanham Act, (2) violated the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA), (3) committed the common-law tort of unfair competition, and (4) committed the common-law tort of tortious interference with contracts. It awarded CPI compensatory damages on the four claims totaling $49.7 million, as well as $140 million in punitive damages.

On appeal, Vivint raises numerous issues, including (1) that the UDTPA requires a showing that CPI itself relied on the false statements made to CPI customers and that because there was no such evidence, Vivint was entitled to judgment on that claim; (2) that CPI failed to introduce evidence sufficient to support the award of $49.7 million in

3

compensatory damages; (3) that the district court misapplied North Carolina's cap on punitive damages; and (4) that the district court erroneously admitted prejudicial evidence after it wrongfully refused to bifurcate the punitive damages portion of the trial from the compensatory damages portion.

After carefully reviewing the record and considering the parties' arguments, we find no reversible error and accordingly affirm the judgment of the district court.

## I

Vivint is one of the nation's largest home security companies, providing alarm systems and associated equipment, as well as 24-hour monitoring services, to residential customers throughout the country. CPI offers the same type of products and services in the southeast region of the country, making the two companies direct competitors in that region.

CPI commenced this action against Vivint in September 2020, alleging that Vivint's door-to-door sales representatives had used false and deceptive practices to induce a significant number of CPI customers to switch to Vivint. It alleged that "[a]s a result of Vivint's deceptive practices, a number of CPI customers . . . confused Vivint's sales agents with CPI representatives, and thus . . . unwittingly found themselves with Vivint's alarm systems installed in their homes and with contractual obligations to both Vivint and CPI." CPI alleged that these deceptive tactics had been employed for years and were also systematic and widespread. Based on these allegations, CPI asserted four claims against Vivint — (1) that Vivint had violated the Lanham Act; (2) that it had violated the North

4

Carolina Unfair and Deceptive Trade Practices Act (UDTPA); (3) that it had committed the common-law tort of unfair competition; and (4) that it had committed tortious interference with business relationships. It sought both compensatory and punitive damages.

During a two-week jury trial, CPI presented testimony from twelve current or former CPI customers who had been solicited by Vivint sales representatives. These witnesses all testified that a Vivint sales representative had used deceptive tactics in an effort to convince them to sign a service contract with Vivint.

For example, Laura Ward testified that a Vivint salesperson told her that Vivint was "buying out CPI" and that she would "no longer have CPI for [her] security company." She stated that she would not have spoken with the Vivint representative if he had been honest. But, feeling "scared and worried," she signed a new contract with Vivint that day, and a technician took down her CPI equipment and replaced it with Vivint equipment. While the Vivint sales representative told her that she would have three days to cancel the contract, when she did not like the new equipment and called to cancel within two days, she was told that it would cost her approximately $2,400 to terminate the contract. When Ward subsequently spoke to a CPI representative and learned that CPI was not being bought by Vivint, she became "very upset." After calling Vivint approximately "three or four times a week" for the next three months, Vivint eventually released her from the contract.

The other customer witnesses had similar accounts of Vivint sales representatives falsely claiming an affiliation with CPI or making false statements about CPI. For instance,

one witness testified that a Vivint sales representative stated that he was "with CPI" and was "one of the guys that installed [his] CPI system."  But when the witness responded that he knew the people who had installed his system, the sales representative pivoted to stating that he was actually with Vivint, but that it was "the parent company of CPI" and that he was "going around to different CPI customers . . . to see if we need to upgrade or update the system they have in their home already."  That customer became "very wary" and even called the police.  But other customer witnesses, like Ward, did switch to Vivint, at least temporarily.  Specifically, of the twelve current or former CPI customers who testified, seven signed new contracts with Vivint as the result of a sales representative's deceptive pitch.  Four of those witnesses eventually got out of their Vivint contracts and returned to CPI.  But three of the witnesses testified that they had continued using Vivint's service, rather than go through the expense and hassle of switching providers again, even though they felt "duped" and "embarrassed."

CPI also presented evidence to show that Vivint's misconduct was widespread and systematic.  The evidence showed that Vivint had trained its sales representatives to focus on overcoming the inherent resistance of customers who were already being served by other security companies, and as Vivint became aware of its sales representatives' use of deceptive sales practices to overcome that resistance, it essentially did nothing.  Indeed, a former Division Vice President for Vivint testified that the company "[a]bsolutely" did not consistently enforce the "rules that prohibited deceptive sales practices."  Moreover, he acknowledged that there were "individuals [who] had compliance issue after compliance

6

issue," and when asked "[w]hat types of deceptive sales practices" he was "aware of at Vivint," he responded, "Name it."

In a similar vein, CPI presented evidence — admitted for the limited purpose of showing Vivint's intent and knowledge — that Vivint sales representatives had used similar practices to target the customers of other competitors, including ADT, and that Vivint had previously settled a similar suit that ADT had brought against it. Evidence also showed that between 2009 and 2022, 16 state attorneys general had brought enforcement actions against Vivint for its sales agents' conduct, which included misrepresenting Vivint's affiliation with a competitor, and that Vivint had entered consent decrees to settle those actions.

As for damages, CPI presented evidence related to four categories — (1) disgorgement of Vivint's ill-gotten profits or, alternatively, damages for CPI's lost profits; (2) damages for injury to CPI's goodwill; (3) the cost of a corrective-advertising campaign; and (4) costs that CPI had already incurred in responding to Vivint's misconduct. CPI was able to identify approximately 565 CPI customers who had switched to Vivint based on complaints the customers had made, and, through expert testimony and Vivint's own prior estimates, it projected that number statistically to estimate that a total of over 11,000 customers had switched as a result of Vivint's practices. It then presented evidence of the money it had lost and the money Vivint had gained from those customers. It also presented evidence related to loss of goodwill, requesting 10% of its ongoing marketing expenditures to compensate it for that loss. In addition to goodwill damages, it presented evidence that it would cost over $10 million to conduct a corrective-advertising

campaign. Finally, CPI presented evidence that it had incurred approximately $1.5 million in expenses to handle the calls it regularly received from customers complaining about Vivint's deceptive trade practices.

The jury returned a verdict in favor of CPI on all four claims asserted, and it awarded $5.4 million on the Lanham Act claim, $13.5 million on the common-law unfair competition claim, $1.5 million on the tortious interference claim, and $29.3 million on the UDTPA claim, for a total of $49.7 million. In addition, it awarded $140 million in punitive damages. Judgment on the jury's verdict was entered on February 17, 2023.

Following judgment, Vivint filed a motion requesting judgment as a matter of law or, alternatively, either a remittitur of the damages award or a new trial. It argued (1) that "limits on double recovery and on non-compensatory damages restrict[ed] CPI's recovery to a subset of the damages awards on the verdict sheet"; (2) that it was entitled to judgment as a matter of law on CPI's UDTPA claim "because CPI failed to prove that it relied on Vivint's alleged misrepresentations"; and (3) that it was entitled to judgment as a matter of law, or at least a remittitur or a new trial, because "the jury's inflated awards resulted from the erroneous admission of inflammatory evidence" and because "CPI failed to introduce sufficient admissible evidence to support the jury's damages awards."

After Vivint filed this motion, the trial judge announced that the case was being reassigned to another judge. Neither party objected to the case's reassignment or requested an explanation, but counsel for the parties were advised that the initial trial judge had recused himself because of a conflict that arose after the trial. The new trial judge reviewed Vivint's motion and conducted a hearing on it several months later.

By an order dated January 8, 2024, the new judge denied Vivint's post-trial motion. With respect to Vivint's contention that the damages award amounted to double recovery for CPI, the court explained that an instruction that the trial judge had twice read to the jury "preclude[d] any risk of 'double recovery'" and that "the jury had sufficient evidence to award nonduplicative damages for each count."  As for the jury's award of punitive damages, the court rejected Vivint's argument that North Carolina's 3-to-1 cap on punitive damages meant that CPI could recover only "three times . . . *one* of the compensatory damages awards," finding instead that the cap should be applied based on the total compensatory damages award.

With respect to Vivint's claim that it was entitled to judgment as a matter of law on the UDTPA claim, the court reaffirmed its earlier summary judgment ruling that CPI was not required to prove "first-party reliance" in order to establish Vivint's violation of the UDTPA.  The district court also rejected Vivint's argument that evidence of other proceedings and regulatory actions against Vivint, as well as customer complaints about Vivint to third parties, should have been excluded under Federal Rules of Evidence 404(b) or 403, or as inadmissible hearsay, concluding that Vivint had "offer[ed] nothing to persuade [it] to revisit [the trial judge's] proper and well-reasoned evidentiary rulings, let alone any basis for relief from judgment" based on those rulings.  Similarly, the court concluded that the trial judge did not err in denying Vivint's motion to bifurcate.  Finally, the court rejected Vivint's argument that there was insufficient evidence to support the jury's award of $49.7 million, pointing to specific evidence in the record that supported the award.

9

From the district court's final judgment, Vivint filed this appeal.

II

Vivint contends first that CPI failed to prove that it relied on the false statements that Vivint made to CPI's customers to lure them away and therefore failed to prove a UDTPA claim. Such reliance, Vivint claims, is an essential element of a UDTPA claim. Based on *Bumpers v. Community Bank of Northern Virginia*, 747 S.E.2d 220, 226–27 (N.C. 2013) (holding that a plaintiff must prove that it detrimentally relied on the defendant's misrepresentation to bring a UDTPA claim based on fraud or misrepresentation), and *D C Custom Freight, LLC v. Tammy A. Ross & Associates*, 848 S.E.2d 552, 560–63 (N.C. Ct. App. 2020) (applying *Bumpers* to a UDTPA claim), Vivint argues that "[u]nder North Carolina law, a plaintiff pursuing a UDTPA claim based solely on a defendant's misrepresentations can establish the element of proximate causation only by proving that it personally relied on the false statements at issue." While Vivint effectively acknowledges that CPI's *customers* relied on Vivint's sales representatives' false claims, it emphasizes that CPI *itself* did not rely on them. Therefore, it argues, it was entitled to judgment on CPI's UDTPA claim.

CPI responds that Vivint misstates its UDTPA claim. Rather than alleging that Vivint *defrauded* it, CPI claims that Vivint engaged in *unfair competition* by deceiving its customers to lure them away, a claim that does not require reliance by CPI. And it points out that a UDTPA claim can be based not only on fraud but also on unfair competition.

10

North Carolina's UDTPA prohibits "[u]nfair methods of competition in or affecting commerce," as well as "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). And it grants a private right of action to "any person . . . injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter." *Id.* § 75-16. Accordingly, to prevail on a claim under the UDTPA, the plaintiff must show (1) an unfair method of competition *or* an unfair or deceptive act or practice, (2) in or affecting commerce, (3) that proximately caused injury to the plaintiff. *See Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000).

When a plaintiff's UDTPA claim is premised on the defendant's having made deceptive statements to the plaintiff, the plaintiff must prove that it relied on the misstatement in order to show causation, *i.e.*, that its injury was "a proximate result of [the] defendant's deceptive statement or misrepresentation." *Pearce v. Am. Def. Life Ins. Co.*, 343 S.E.2d 174, 180 (N.C. 1986). This type of UDTPA claim, which is well established in North Carolina law, sounds in fraud. *See Bumpers*, 747 S.E.2d at 222 (recognizing that the UDTPA "has long encompassed conduct tantamount to fraud"). In such cases, like in all fraud claims generally, the plaintiff must prove that it *actually relied* on the defendant's misrepresentation and that this reliance was reasonable. *Id.* at 227. For example, in *Bumpers*, borrowers alleged that while their lender had charged them a fee that was labelled as a "loan discount fee," they had not, in fact, received discounted loans. *Id.* at 223. In that circumstance, the court held that the plaintiffs needed to prove that they had relied on the misrepresentation. *Id.* at 226–27. The court explained that common-law "fraud . . .

11

requires reliance" and that it saw "no reason for departure from that requirement" in the context of the UDTPA claim before it. *Id.* at 222. Thus, the *Bumpers* plaintiffs could not prevail simply by showing that they had paid a deceptively labelled fee; instead, they needed to show that they had "affirmatively incorporated the alleged misrepresentation into [their] decision-making process," such that "if it were not for the misrepresentation, [they] would likely have avoided the injury altogether." *Id.* at 227.

While the *Bumpers* court expressly recognized that the UDTPA "has long encompassed conduct tantamount to fraud, which requires reliance," 747 S.E.2d at 222, it also pointed out that the "statute is broader and covers more than" fraud, *id.* at 226. Indeed, the statute plainly proscribes "[u]nfair methods of competition" in addition to "unfair or deceptive acts or practices." N.C. Gen. Stat. § 75-1.1(a). And because CPI's UDTPA claim is grounded on unfair competition — based on Vivint's stealing CPI customers by telling them lies about CPI, its competitor — *Bumpers* is inapposite here. As is the *D C Custom Freight* decision, which purported to do nothing more than apply *Bumpers*. *D C Custom Freight*, 848 S.E.2d at 230–34.

Unfair competition is a broad concept and certainly encompasses a business's telling damaging lies about one of its rivals to lure away its customers. *See Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2011) (explaining that for the purposes of the UDTPA, "a practice is unfair if it is unethical or unscrupulous" (cleaned up)). A claim alleging such conduct that is brought by a business against one of its competitors does not sound in fraud but rather in other traditional common-law torts, like tortious interference with contract and unfair competition. *See Henderson v. U.S. Fid. & Guar. Co.*, 488 S.E.2d 234, 239 (N.C.

1997) (recognizing that, under North Carolina law, "the common law tort of unfair competition [is] an offense committed in the context of competition between business rivals"). And such unfair competition claims do not have as an element the plaintiff's reliance on the defendant's lies. Rather, the plaintiff need only show that the unfair competition proximately caused its injuries. *See Gray*, 529 S.E.2d at 681.

We therefore find no merit in Vivint's argument that, to prove the proximate-causation element of its UDTPA claim, CPI was required to prove that it relied on the misrepresentations that Vivint made to CPI's customers. Accordingly, we reject Vivint's contention that it is entitled to judgment as a matter of law on CPI's UDTPA claim.

## III

Vivint next contends that CPI failed to introduce evidence sufficient to support the jury's damages award. As it argues, "Each of the $5.4 million in Lanham Act damages, $13.5 million for common law unfair competition, $29.3 million in damages under the UDTPA, and $1.5 million for tortious interference with seven customer contracts lacks sufficient support in the evidence." Alternatively, it requests that we reduce the judgment to $274,343.20, which "reflects the maximum amount of lost profits CPI suffered for the seven customer contracts [of witnesses who testified] for which it alleged interference plus . . . $250,000 in punitive damages." Vivint argues that, other than introducing evidence supporting this total, CPI "failed to offer any competent, reliable evidence to . . . prove damages with any reasonable certainty."

13

The standard for reviewing damages awards is not disputed. Because "the assessment of damages is entrusted to the jury," our task is to "view the facts in the light most favorable" to CPI and affirm the jury's verdict so long as there was "sufficient evidence for a reasonable jury to have found" as the jury did. *First Union Com. Corp. v. GATX Cap. Corp.*, 411 F.3d 551, 556 (4th Cir. 2005) (cleaned up). In other words, we will uphold the $49.7 million damages award "unless no substantial evidence [was] presented to support it, it is against the clear weight of the evidence, it is based upon evidence that is false, or it will result in a miscarriage of justice." *Id.* (quoting *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1279 (4th Cir. 1994)).

During the trial, CPI presented evidence to support its claim for a monetary award based on four distinct categories: (1) disgorgement or, alternatively, CPI's lost profits; (2) injury to CPI's goodwill; (3) the cost of a corrective-advertising campaign; and (4) the costs that CPI had already incurred in responding to Vivint's misconduct. While the district court allowed CPI to present evidence on those four categories and allowed the jury to award damages for each category, it clearly and repeatedly instructed the jury "*not [to] award duplicative damages* for the same conduct." (Emphasis added). But the verdict form, to which the parties agreed, called for a general verdict, requesting simply that the jury enter the amount it was awarding for each of CPI's four claims. As a result, the jury awarded damages for each claim *without specifying* which category or categories of damages were included in each award. Thus, any attempt to determine which category of damages was included in each claim's award would be mere speculation. *See Robinson v. Equifax Info. Servs.*, 560 F.3d 235, 242 (4th Cir. 2009) (explaining that because "the parties

14

agreed to the use of a general verdict form that did not separate damages for emotional distress from those for economic injury," "[i]t would be pure speculation and guesswork for us to attempt to attribute any particular portion of the jury's award to emotional distress damages"). Consequently, on review, we must affirm the jury's verdict if CPI's evidence as to any combination of the four categories was, taken together, sufficient to support the jury's award of $49.7 million. We conclude that the evidence was indeed sufficient.

CPI's first category of damages was for disgorgement, an equitable remedy based on the principle that a wrongdoer should not be permitted to "make a profit out of his own wrong." *Liu v. SEC*, 591 U.S. 71, 79–80 (2020) (quoting *Root v. Ry. Co.*, 105 U.S. 189, 207 (1882)). As the Supreme Court has explained, while disgorgement "may have gone by different names" over the years — including restitution and accounting — "a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts." *Id.* Such awards are, however, limited "to *net profits* from wrongdoing," thus requiring the deduction of "legitimate expenses." *Id.* at 84 (emphasis added); *see also Potter v. Hilemn Lab'ys, Inc.*, 564 S.E.2d 259, 265 (N.C. Ct. App. 2002) ("Restitution measures the remedy by the wrongdoer's unjust enrichment, and seeks to force disgorgement of that gain" (citing 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 4.1(1), at 555 (2d ed. 1993))).

While CPI was required to prove the amount of disgorgement, like its other damages, "with reasonable certainty," *Kansas v. Nebraska*, 574 U.S. 445, 486 (2015) (Thomas, J., concurring in part and dissenting in part) (citation omitted), that standard does not require the plaintiff "to show an exact dollar amount with mathematical precision,"

*Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 620 S.E.2d 222, 231 (N.C. Ct. App. 2005). Instead, CPI was only required to "present relevant data providing a basis for a *reasonable estimate.*" *Id.* (emphasis added) (citing *Whiteside Ests., Inc. v. Highlands Cove, L.L.C.*, 553 S.E.2d 431, 440 (N.C. Ct. App. 2001)); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(d) (A.L.I. 2011) ("A claimant who seeks disgorgement of profit has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain").

We conclude that CPI's evidence was sufficient to allow the jury *to reasonably estimate* that Vivint had made as much as $52 million in net profits from its systematic conduct of targeting CPI customers with deceptive sales practices and luring them away to become Vivint customers. To estimate the number of customers lost, CPI introduced a spreadsheet produced by Vivint in discovery that contained notes on over 13,000 customer complaints mentioning CPI that were received by Vivint between 2016 and 2021. CPI then cross-referenced the names and addresses included in that spreadsheet with its database of current and former customers to identify 565 CPI customers who had made a complaint to Vivint mentioning CPI and who had switched to Vivint.

CPI then presented evidence that, because most customers do not take the time to complain, these 565 former customers represented only a fraction of the total number of customers that CPI had lost to Vivint because of Vivint's deceptive practices. Dr. Russell Winer, CPI's expert witness in the field of marketing and consumer behavior, testified that it was well accepted in the academic literature that "there are more people [who] are upset than, in fact, voice complaints" and that, as a result, "the full impact of Vivint's actions go

well beyond the documented complaints." Dr. Winer declined to "put a specific number [on] it," noting that "there's some variation in the studies." But he did note that some studies estimate that as many as 95% to 97% of people do not complain after a bad customer service encounter. Indeed, CPI introduced an internal Vivint document from 2014 estimating that only 5% of dissatisfied customers make complaints to company headquarters or the Better Business Bureau, thus suggesting that a multiplier of 20 could be used to approximate the number of customers with similar concerns. CPI also presented evidence that, in a similar lawsuit that Vivint had brought against a competitor in 2012, Vivint had argued that "[t]he customer complaints that [it] had received about [this other competitor] [were] likely the tip of the iceberg" and that "[i]t is commonly accepted . . . that only a limited number of affected customers, roughly 4%, actually will take the time to complain." Thus, using a complaint rate of 5%, CPI presented evidence from which the jury could reasonably find that the total number of customers lost was 20 times 565 — or roughly 11,300.

In terms of its loss-per-customer, CPI presented evidence that its average "recurring monthly revenue" per customer account was $48.30, that the average customer stayed with CPI for 96 months, and that CPI's profit margin per customer account was between 65% and 75%. Based on this, CPI estimated that it earned, on average, approximately $2,800 to $3,400 in profit from each customer account. Conversely, CPI estimated Vivint's gain-per-customer based on Vivint's average recurring monthly revenue of $64.75, its average subscriber lifetime of 92 months, and its average profit margin. That value to Vivint was approximately $4,000 to $4,700 for each account. Multiplying a value in the upper end of

17

that range by the estimated number of customers that Vivint had taken from CPI through misconduct, CPI argued to the jury that it should award $52 million to CPI to disgorge Vivint's ill-gotten profits.

In addition to seeking disgorgement — or its own lost profits, which would have been a smaller sum — CPI also sought compensatory damages for (1) the loss of goodwill and damage to its brand; (2) the amount of money necessary to conduct an appropriate corrective-adverting campaign; and (3) the expenses that CPI had incurred in responding to Vivint's misconduct.

As to evidence for loss of goodwill, CPI's Vice President of Accounting and Corporate Controller testified that CPI had spent "a large amount of [its] revenue on marketing" — specifically, $135 million during the period from 2016 to 2022. He further testified that CPI "believe[d] that [its] brand ha[d] been tarnished" with both current and potential customers because of the "deceptive sales practices exhibited by Vivint." Similarly, Dr. Winer also testified as to his conclusion that "Vivint's salespeople have exploited and damaged CPI's brand." Based on this evidence, CPI argued to the jury that 10% of the $135 million it had spent on marketing, or $13.5 million, would compensate CPI for the damage Vivint had done to its brand. And in instructions to the jury, the court confirmed that the jury could consider how much CPI had spent "to build its reputation . . . in order to estimate the harm resulting from Vivint's actions."

As to the amount necessary to conduct a corrective-advertising campaign, CPI's marketing expert, Dr. Winer, testified that an appropriate remedial campaign would include going door-to-door to visit all of CPI's customers — a number greater than 200,000. He

estimated, based on particularized data, that this effort would take about three months and would cost about $10.8 million.

Finally, CPI presented evidence of the costs that it had already incurred in responding to Vivint's misconduct. Its Vice President for Customer Operations testified that, because CPI customer-service representatives had regularly received calls from customers about Vivint's deceptive sales practices, CPI had to provide a special training to prepare its representatives to handle such questions and complaints. To estimate its costs, CPI presented evidence that, from 2016 to 2022, it had spent a total of $10 million on its customer retention department (excluding bonuses). While it acknowledged that not all that money was spent responding to Vivint's practices, it maintained that 15% of the $10 million — or $1.5 million — would compensate CPI for the time its personnel had spent "dealing with messes created by Vivint."

In instructing the jury with respect to damages, the district court made clear that the jury should "not award duplicative damages for the same conduct," but it allowed the jury to assign damages of any category to the four claims that CPI had made, as appropriate.

We conclude that the evidence CPI presented, considered as a whole, was sufficient to allow the jury to reasonably estimate that CPI's damages were $49.7 million, as apportioned over its four claims.

19

IV

Finally, Vivint makes several arguments in support of its contention that, "at minimum, judgment should be vacated and a new trial ordered at least as to damages." We address these arguments in order.

A

First, Vivint argues that CPI was "barred by law from recovering four different compensatory damages awards *for the same conduct*," arguing in particular that "the district court committed an error of law by permitting CPI to recover compensatory damages under both the UDTPA and each of the underlying predicate claims." (Emphasis added). Of course, it is clear that duplicative damages should not be permitted. And it follows from this basic principle that "[w]here the same course of conduct gives rise to a traditionally recognized cause of action, . . . and as well gives rise to a cause of action for violation of [the UDTPA], damages may be recovered either for the [traditional cause of action], or for violation of [the UDTPA], but not for both," precisely so that the jury does not "assess damages against the defendants twice for the same default." *Marshall v. Miller*, 268 S.E.2d 97, 103 (N.C. Ct. App. 1980); *see also United Lab'ys, Inc. v. Kuykendall*, 437 S.E.2d 374, 379 (N.C. 1993) (quoting this statement in *Marshall* with approval).

But Vivint's argument misunderstands the jury's verdict. The general verdict form, to which the parties agreed, required the jury to determine Vivint's liability on the four claims presented — the Lanham Act claim, the UDTPA claim, the common-law unfair competition claim, and tortious interference with contract claim — and then to enter a damages amount as to each claim. And in instructing the jury, the district court repeatedly

20

told the jury that when awarding damages, it should not duplicate damages for the same conduct. Indeed, when the jury asked a question during its deliberations about the verdict form, the court re-read the specific portion of the instructions that prohibited duplicative damages. Because of that dialogue, we have even more confidence than usual that the jury followed the court's instruction and found that CPI was damaged in the total amount of $49.7 million, which it allocated among the four claims.

Accordingly, we are satisfied, based on the district court's clear instructions to the jury on this precise issue, that the jury did not provide CPI with duplicative damages.

B

Vivint next argues that the punitive damages award of $140 million exceeded North Carolina's cap limiting punitive damages to "three times the amount of compensatory damages." N.C. Gen. Stat. § 1D-25(b). While the $140 million punitive damages award did not exceed three times the total award of $49.7 million in compensatory damages, the $49.7 million award included damages on the Lanham Act claim and the UDTPA claim. Because punitive damages are not recoverable for violations of either the Lanham Act or the UDTPA, Vivint contends that the maximum punitive damages that CPI could obtain was "three times the damages the jury awarded on the unfair competition and tortious interference claims," as those were "the only claims for which punitive damages [were] authorized." Thus, according to Vivint, because the jury awarded $15 million for those two common-law claims, the maximum amount of punitive damages that CPI could recover was $45 million.

21

In response, CPI argues that we should reject Vivint's attempt to "rewrite" the North Carolina punitive damages statute to apply "on a *per-claim* basis" and that the district court correctly recognized that the *total compensatory damages award* — $49.7 million — must be trebled to determine the cap, regardless of whether punitive damages are authorized for each of the claims. Thus, CPI maintains that the $140 million in punitive damages that the jury awarded it fell below the statutory maximum.

We turn first to the statute itself, which governs "every claim for punitive damages" and applies "regardless of whether the claim for relief is based on a statutory or a common-law right of action or based in equity." N.C. Gen. Stat. § 1D-10. The statute provides that "[p]unitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages" and proves "by clear and convincing evidence" the existence of one of three aggravating factors — fraud, malice, or willful or wanton conduct — which must be "related to the injury for which compensatory damages were awarded." *Id.* § 1D-15. Punitive damages under the North Carolina statute are thus designed "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." *Id.* § 1D-1.

To ensure that punitive damages remain proportional, the North Carolina statute places a limit on their amount, providing that "punitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or $250,000, whichever is greater." N.C. Gen. Stat. § 1D-25(b) (cleaned up). While *the jury* determines the amount of punitive damages without regard to or knowledge of the cap, *see id.* § 1D-25(c), *the court* reviews the award and reduces it, if necessary, to conform it to the cap, *id.*

22

§ 1D-25(b). Moreover, "[i]n all actions seeking an award of punitive damages," the jury must "determine the amount of punitive damages separately from the amount of compensation *for all other damages*." *Id.* § 1D-25(a) (emphasis added).

Accordingly, when punitive damages are claimed in an action, based on one or more eligible claims, the jury first determines whether the defendant is liable for compensatory damages and, if so, the amount of compensatory damages to award. *See* N.C. Gen. Stat. §§ 1D-15, -25. If the jury finds the defendant liable on a claim in the action for which punitive damages may be awarded, it then determines whether the plaintiff has also established by clear and convincing evidence that the defendant engaged in fraud, malice, or willful or wanton conduct, so as to warrant punitive damages. *Id.* § 1D-15. Only then does the jury determine the amount of punitive damages to award, which it does without regard to the cap. The trial court is charged with then comparing the jury's award of punitive damages to its award of "compensation *for all other damages*" and reducing the punitive damages award if it exceeds the statutory maximum — "three times *the amount* of compensatory damages." *Id.* § 1D-25 (emphasis added); *see also Rhyne v. K-Mart Corp.*, 562 S.E.2d 82, 92 (N.C. Ct. App. 2002) (recognizing that "[a]ll compensatory damages awarded to a party must . . . be totaled to one number for consideration of the cap").

Thus, it is irrelevant when applying the cap whether some of the compensatory damages were awarded for claims that are not themselves eligible for punitive damages. The statute does not distinguish between the two types of claims and instead provides a

simple formula designed to ensure proportionality between all the compensatory damages awarded and the punitive damages awarded.

Moreover, contrary to what Vivint argues, the statute, by operating in this manner, does not authorize an award of punitive damages on claims for which punitive damages are not available — here the Lanham Act and the UDTPA counts. As the record in this case makes clear, the jury did not award punitive damages on those counts. The district court specifically instructed the jury that it could award punitive damages *only if* it had found Vivint liable for compensatory damages on one of its common-law tort claims. The court further instructed the jury that, before awarding punitive damages, it must find that CPI had proved by clear and convincing evidence that Vivint had engaged in "willful or wanton conduct" and must consider what amount of punitive damages was "reasonably needed to punish Vivint for egregiously wrongful acts and to deter Vivint and others from committing similar wrongful acts." Following these and other instructions, the jury concluded that $140 million was the appropriate amount. Thus, there is nothing to support Vivint's argument that punitive damages were awarded on CPI's Lanham Act and UDTPA claims; they were awarded on the common-law tort claims and based on the jury's finding of willful or wanton conduct by Vivint.

To be sure, in determining whether the award exceeded North Carolina's cap on punitive damages, the court did indeed focus on all compensatory damages awarded in the action. But in doing so, it did not *award* punitive damages on the Lanham Act and UDTPA claims. Rather, it performed the task set forth in the statute of ensuring that the punitive

damages awarded on the common-law tort claims bore the prescribed measure of proportionality to the compensatory damages awarded in the action.

Accordingly, we reject Vivint's argument that the district court misapplied North Carolina's cap on punitive damages.

C

Vivint also argues that the district court abused its discretion in denying its motion to bifurcate the punitive damages portion of the trial from the compensatory damages portion. And relatedly, it contends that the district court's "erroneous admission of prejudicial evidence" requires a new trial.

While the North Carolina punitive damages statute does indeed provide for bifurcation, *see* N.C. Gen. Stat. § 1D-30, this case was tried in federal court, and therefore the bifurcation issue was controlled by federal rules, specifically Federal Rule of Civil Procedure 42, *see McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 974 (4th Cir. 2020). Rule 42 gives the district court discretion on whether to "order a separate trial of one or more separate issues." Fed. R. Civ. P. 42(b). And we have recognized that "since the evidence usually overlaps substantially, the normal procedure is to try compensatory and punitive damage claims together with appropriate instructions." *McKiver*, 980 F.3d at 974–95 (cleaned up). Thus, "the party requesting separate trials bears the burden of convincing the court that such an exercise of its discretion" is warranted. *Id.* at 975 (cleaned up).

We have found nothing in the record from which to conclude that the district court's denial of Vivint's motion to bifurcate constituted an abuse of discretion. And Vivint has failed to identify any evidence that required bifurcation in order to ensure a fair proceeding.

Indeed, Vivint has also failed to identify *any* erroneous evidentiary ruling that requires a new trial.

For example, Vivint challenges the district court's admission of two video depositions of ADT customers that were taken as part of ADT's earlier suit against Vivint based on similar allegations. The district court, however, reasonably concluded that the evidence was relevant to Vivint's intent and knowledge, and it also gave the jury a limiting instruction that it should not "confuse alleged misconduct . . . against ADT as alleged misconduct against CPI."

Vivint also challenges, as irrelevant and prejudicial, evidence that "Vivint was the target of investigations and lawsuits brought by the FTC, DOJ, and sixteen state attorneys general" and that "allow[ed] the jury to learn that Vivint settled the prior litigation and enforcement actions without a limiting instruction." Contrary to Vivint's representation, the district court declined to admit the evidence of the FTC and DOJ settlements, and when they were referenced, it instructed the jury not to consider them. As for the evidence pertaining to the state enforcement actions, the court admitted the evidence for "the limited purpose" of showing Vivint's knowledge and intent, *see* Fed. R. Evid. 404(b)(2), and as relevant to punitive damages. We conclude that the court did not abuse its discretion in doing so.

Finally, Vivint contends that "the district court erred by allowing CPI to present its purported lost profits calculation for the first time at trial, even though it was not properly disclosed." The portions of the record cited by Vivint, however, fail to support this assertion.

At bottom, we see nothing in the record to persuade us that a new trial is required or warranted based on the district court's ruling on bifurcation or its evidentiary rulings.

### D

Finally, Vivint argues that "[t]he trial judge's unexplained post-trial reassignment [to another judge] supports a new trial here."  It complains that "[t]he lack of information surrounding the reassignment led to an inference of partiality, affecting the entire proceeding."  Vivint, however, does not dispute CPI's representation that the original trial judge informed the parties at the time of the reassignment that he needed to recuse himself because a conflict that arose after the trial.  Moreover, Vivint did not object to the reassignment at the time it occurred or request any information about the conflict.  This argument, we find, is merely of the tilting-at-windmills variety.

*       *       *

Vivint had its day in court, and the two-week trial was essentially a fair one.  The district court performed well within its discretion in making procedural rulings, and the jury spoke clearly, based on the evidence.  We have found no basis to modify the result or to order a new trial.  Accordingly, the judgment of the district court is

AFFIRMED.

27